UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

SARA A.[1],                                        )
                                                   )
          Plaintiff,                               )
                                                   )
     v.                                            )          CIVIL NO.  3:19cv144
                                                   )
ANDREW M. SAUL,                                    )
Commissioner of Social Security,                   )
                                                   )
          Defendant.                               )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application Supplemental

Security Income (SSI), as provided for in the Social Security Act.  Section 205(g) of the Act

provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the

transcript of the record including the evidence upon which the findings and decision complained

of are based.  The court shall have the power to enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with

or without remanding the case for a rehearing."  It also provides, "[t]he findings of the

[Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42

U.S.C. §405(g).

     The law provides that an applicant for SSI must establish an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of no less than 12 months. . . ."

42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an

─────────────────────────

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant has not engaged in substantial gainful activity since July 16, 2014, the application date (20 CFR 416.971 *et seq.*).

2.      The claimant has the following severe impairments: residuals of a cerebral vascular accident (CVA), organic brain disorder, depression, and personality disorder (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she has additional limitations. She can lift twenty pounds occasionally and ten pounds frequently. She can stand or walk two hours in an eight-hour workday. She can sit six hours in an eight-hour workday. She cannot climb ladders, ropes, or scaffolds. She can perform all other postural maneuvers occasionally. The claimant is limited to simple, repetitive tasks with no hourly quotas, but she can do end-of-day quotas. She can have occasional contact with the general public. She can adapt to routine changes in the work environment.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on February 3, 1992 and was 22 years old, which is defined as a younger individual age 18-49, on the date the application was filed (10 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since July 16, 2014, the date the application was filed (20 CFR 416.920(g)).

(Tr. 37- 45).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to SSI. The

ALJ's decision became the final agency decision when the Appeals Council denied review. This

appeal followed.

Plaintiff filed her opening brief on August 7, 2019. On October 9, 2019, the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on October 24, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

On October 27, 2008, at age 16, Plaintiff suffered a spontaneous right frontal intracranial hemorrhage with left hemiparesis. (Tr. 321, 419, 440-42.) The extent and severity of the cerebrovascular accident was confirmed by CT scan of the head. (Tr. 441, 448, 450.) Plaintiff suffered a grand mal seizure during this episode and sustained a tongue laceration. (Tr. 419.) She

was "life-flighted" to Indiana University Hospital for hematoma evacuation. (Tr. 456.) However, the surgery had to be stopped because of low clotting factor, and she was placed in an artificial coma for several days. (Tr. 421.) Plaintiff underwent an external shunt placement. (*Id.*) Once the bleeding and pressure of the brain were stabilized, the shunt was removed, and on November 21, 2008, she was transferred back to Memorial Hospital's Intensive Care Unit. (*Id.*)

Plaintiff was an inpatient at Memorial Hospital until December 4, 2008, where she continued to undergo intensive treatment and testing. (Tr. 670.) On November 22, 2008, she underwent an inferior venocavogram, which showed chronic venous thrombosis/occlusion of the iliac veins as well as the distal inferior vena cava. (Tr. 668.) On November 25, 2008, Plaintiff had a hematology consultation for bleeding diastasis. (Tr. 661-62.) She was unresponsive, only moving her eyes. (Tr. 662.) The December 1, 2008 brain CT scan showed that she was status post right hemicraniectomy. (Tr. 664.) There was extensive edema and encephalomalacia involving the right temporal and parietal lobes. (*Id.*) Compared to the November 22, 2008 CT scan, the test showed increased (1) degree of edema (2) protrusion through the craniectomy defect and (3) hydrocephalus with ventricular dilatation. (Tr. 664-65.) The December 4, 2008 CT scan of the brain continued to reveal similar abnormalities. (Tr. 666.)

At discharge from Memorial Hospital on December 4, 2008, Plaintiff's diagnoses were: (1) status post respiratory failure, resolved; currently with tracheostomy size 6 cuffless, (2) status-post subarachnoid hemorrhage with decompression craniotomy and hydrocephalus, improving, (3) hematuria with bleeding tendency, (4) UTI secondary to E. coli sensitive. (Tr. 670.)

Plaintiff was transferred to Rivercrest, a long-term care facility, on December 4, 2008, and continued outpatient diagnostic testing. (Tr. 670-72.) The December 12, 2008 brain CT showed

(1) interval increased size of the ventricles with increasing herniation of the brain through the craniectomy defect on the right, and (2) rounded focus of hyperattenuation of the region of the right sylvian fissure measuring 9mm. (Tr. 650-51.) A follow up brain CT scan on December 18, 2008, showed: (1) continued herniation of the brain through the craniotomy site, which is similar to, perhaps slightly increased, and (2) rounded focus of hyperattenuation in the region of the right sylvian fissure again noted, previously measuring 9 mm and then 7mm. (Tr. 648-49.)

Plaintiff was at Rivercrest for approximately 18 days when she developed headaches and vomiting. On December 22, 2008, she was transferred back to Memorial Hospital and found to have increased hydrocephalus. (Tr. 448, 450, 461.) She was admitted to the Neurosurgical Department and monitored for signs of intracranial pressure until her discharge back to Rivercrest on December 29, 2008. (Tr. 461.) Plaintiff was admitted to Indiana University Hospital from January 5 to 13, 2009, and during this admission, she underwent a replacement of hemicraniectomy bone flap and a ventriculoperitoneal shunt drain. (Tr. 460-62.) She was transferred to the Rehabilitation Hospital of Indiana on January 13, 2009, to "undergo daily physical therapy, occupational therapy, and speech therapy for cognition." (Tr. 462.)

On January 23, 2009, Bradley Hufford, Ph.D., conducted an inpatient neuropsychological examination of Plaintiff. (Tr. 608-12.) During his initial examination on January 16, 2009, he observed that Plaintiff exhibited organizational difficulties, slowed processing speed, sustained attention problems, and impulsivity/disinhibition. (Tr. 608.) She had increased emotional lability, helped significantly by Zoloft. (*Id*.) Besides a flat affect, no other neurobehavioral difficulties negatively impacted test performance. (Tr. 609.) Her IQ scores were: Full Scale, 83 (low average range); Verbal, 103 (average); and Performance, 67 (extremely low range) (*Id*.) Dr. Hufford noted

that her verbal IQ score is "the most meaningful predictor of her intellectual ability as Performance IQ estimates are attenuated by visual spatial difficulties secondary to her hemorrhage." (*Id*.)

The neuropsychological screening results showed impairment in brain functions affecting the anterior cerebral areas more than the posterior regions and the right cerebral hemisphere more than the left. (Tr. 610.) Other findings included: (1) average range of intelligence, (2) left-handed motor impairment, (3) moderately impaired executive functions, (4) mild to moderately impaired visual spatial deficits, (5) mildly impaired attention, and (6) prominent disinhibition, flat affect and emotional lability. (Tr. 610.) Dr. Hufford opined that Plaintiff will likely have greater difficulties with attention in busy/demanding situations or when particularly tired, stressed or ill. (Tr. 611.) She should be allowed socialization with peers but, early after discharge, this should supervised by parents or other knowledgeable adults. (*Id*.) Repeat testing within three to six months was recommended. (*Id*.) In the academic setting, attentional compensations will be necessary, including: (1) extra time to take tests in quiet area, (2) avoiding multi-tasking, and (3) having instructors make eye contact with her when giving directions and ensuring she understands by having her repeat back important information. (*Id*.) Dr. Hufford anticipated she will have significant difficulty attempting to listen to lecture-type material and taking notes at the same time. (*Id*.) Additionally, Plaintiff requires organizational compensations. (Tr. 611-12.)

Plaintiff was admitted to Elkhart General Hospital Rehabilitation from January 30 through February 6, 2009 to continue her rehabilitation closer to home. (Tr. 419-23.) She underwent comprehensive inpatient rehabilitation (Tr. 420, 423) and repair of the tongue laceration sustained during a seizure (Tr. 425). After discharge, she underwent comprehensive outpatient

rehabilitation. (Tr. 321-34.) She presented with mild to moderate cognitive-linguistic deficits characterized by impulsivity, decreased problem solving, organization, divided attention, inferential/deductive reasoning skills, new learning/long-term memory, problem solving and decreased voicing. (Tr. 322.) Physical therapy 2-3 times weekly for 12-16 weeks for functional mobility training, balance and gait training was recommended. (Tr. 327.) An occupational therapy evaluation showed impairment in problem solving, judgment/safety and organization and planning. (Tr. 329.) The assessment also revealed decreased strength, impaired coordination, physical demand levels/vocational limitations, limited task behaviors, and impaired balance. (Tr. 328-29.) Outpatient occupational therapy two to three times per week was also recommended. (Id.)

The April 2009 EEG was abnormal, showing "left temporal sharp and sharp wave activity" suggestive of an epileptogenic foci. (Tr. 340.) In April 2009, five months post-CVA, Plaintiff also underwent an evaluation by Dr. Wendell Roher, Ph.D. (Tr. 341-49.) The testing showed significant improvement in the areas of psychometric intelligence and attention/concentration; however, there continued to be a decrease in psychometric intelligence from premorbid levels. (Id.) Her full-scale IQ was 91 (Tr. 343) and she was being home schooled at the time (Tr. 342). Plaintiff showed slowed gait and bilateral foot slap, with a slight shuffling movement. (Id.) Her affect "remains rather blunted and slow in formation," and insight and awareness were lacking. (Id.) On motor skill testing, performance with her dominant right hand fell in the low-average range, but "fine motor dexterity and motor speed remain[ed] severely impaired" for the left hand. (Tr. 347.) She had difficulty integrating the left hand in tasks typically bimanual. (Id.) She had difficulty with increased auditory processing demands, consistent with

her right hemisphere hemorrhage. (Tr. 345.) Dr. Roher's diagnoses were: Axis I, cognitive

disorder, due to spontaneous right hemisphere hemorrhage; rule out organic personality change

due to right hemisphere hemorrhage (apathetic-type); Axis III, status-post spontaneous right

hemisphere hemorrhage. (Tr. 347.) Ongoing physical, occupational and speech therapy was

recommended. (Tr. 348.)

On December 13, 2010, Plaintiff underwent cranioplasty, the second stage of a two- stage

reconstruction to repair her cranial defect. (Tr. 464.)

Plaintiff was hospitalized from November 17 to 23, 2012 for suicidal ideation and suicidal

gestures. (Tr. 289.) She had been in psychiatric treatment with "Dr. Malik for the past 2 years."

(*Id*.) On admission, she reported worsening depression, feeling worthless, helpless, anhedonic,

and lacking energy or interest in activities. (Tr. 290.) She also reported increased panic episodes

daily over the previous two weeks. (*Id*.) As of November 19, she still had suicidal ideation as an

inpatient. (Tr. 291.) On discharge on November 23, her diagnoses were: Axis I, Major depressive

disorder, recurrent/severe with suicidal ideation and gestures; cognitive disorder secondary to

brain hemorrhage; Axis II, personality changes secondary to brain hemorrhage; Axis III, history

of subarachnoid hemorrhage in 2008 with subsequent neurosurgery; Axis IV, family conflict,

poor coping skills; Axis V, Global assessment of functioning (GAF) of 25 on admission and 70

on discharge. (Tr. 289.) She was to follow with Dr. Malik as an outpatient. (*Id*.)

The May 21, 2013 brain CT scan showed evidence of previous intracranial hemorrhage

and infarction in the right frontal parietal zone with persistent encephalomalacia and dural

calcifications. (Tr. 633-34.) Overlying craniotomy defect present with surgical material and graft

in place; appearance was not significantly changed compared to prior study other than resolution

of residual areas of hemorrhage. (*Id.*) The shunt was in good position, no hydrocephalus. (*Id.*)

On December 4 and 17, 2013, Plaintiff underwent a neuropsychological evaluation by Mark DeVries, Ph.D. (Tr. 636-42.) She was a student at Goshen College but was suspended for destruction of another student's property. (Tr. 636.) Plaintiff was treated by a psychiatrist and counselor at the Center for Behavior in Elkhart "but was dismissed from that practice after three years." (*Id.*) She was on Effexor 75 mg, and her parents were concerned about manic episodes associated with Effexor in the past. (*Id.*) Lithium was discontinued due to ineffectiveness. (*Id.*) Symptoms included deficits in memory and comprehension; her parents reported issues with not following through with responsibilities, manipulative behavior, poor decision-making, and cognitive problems. (Tr. 637-38.) During examination, Plaintiff was passively cooperative and very guarded with a flat affect. (Tr. 638.) She provided brief responses and one-word answers. (*Id.*) She worked slowly, but there was no indication of suboptimal effort or purposeful attempt to do poorly. (*Id.*) However, the MMPI profile was invalid due to the likelihood of over-reporting symptoms. (*Id.*) While the MMPI was invalid and not useful diagnostically, it indicated significant emotional distress, which was clinically evident in symptoms of depression, anxiety, derealization, distrust, suicidal ideation and confused thinking. (Tr. 640.)

Neuropsychological testing showed a decline in general intellectual ability from baseline, but improvement since 2009. (Tr. 641.) Dr. DeVries stated that the testing "shows significant deficits in both verbal and visual memory accompanied by deficits in executive functioning." (Tr. 638.) Plaintiff currently "presents with very significant emotional distress as indicated by significant distress reported on the MMPI-2-RF and as evidenced by her behavior during the feedback session, which involved report of symptoms of derealization, thoughts of self-harm, and

10

active suicidal ideation." (*Id.*) During the interview, she reported having chronic and acute suicidal thinking and was referred to Pine Rest for psychiatric hospitalization evaluation. (*Id.*) Dr. DeVries diagnosed: Axis I, Major depressive disorder, recurrent, severe, without psychotic features; Cognitive disorder, not otherwise specified; Axis II, diagnosis deferred (Borderline features noted); Axis III, late effects of intracranial injury. (Tr. 641.) Dr. DeVries stated that the history of impulsivity and problems with executive functioning tasks on current testing suggested ongoing frontal dysfunction. (*Id.*) The extent to which deficits are directly related to her brain hemorrhage is very difficult to ascertain due to the presence of "significant emotional distress." (Tr. 641.) Dr. DeVries recommended psychiatric treatment and neurological following. (Tr. 641-42.)

Plaintiff was hospitalized again from December 13, 2013 to January 3, 2014 for depression, anxiety, and suicidal ideation with the intent and plan to overdose. (Tr. 470.) She was suspended from school for the semester for vandalism, and she had cut her wrist with a razor on the day of admission. (*Id.*) Plaintiff reported worsening depression for at least four months. (*Id.*) She endorsed difficulty concentrating, lack of enjoyment in activities, friends or socializing. (*Id.*) Plaintiff admitted neglecting her personal care. (*Id.*) She noted decreased sleep, variable appetite and weight loss. (Tr. 471.) She had stopped taking Effexor in July 2013 at the recommendation of her psychiatrist. (*Id.*) Her mood was depressed and affect somewhat restricted; she sometimes feels parents and family members are talking about her. (Tr. 473.) On admission, she was given Effexor as the primary antidepressant medication, and melatonin, Trazadone and Seroquel for insomnia; however, Seroquel was discontinued due to episodic tremors and replaced with Geodon. (Tr. 476.) Plaintiff had an episode of uncontrolled mood and self-harm. (*Id.*) At

discharge, her diagnoses were: Axis I, Depressive disorder; Axis II, Borderline personality disorder; Axis III, history of brain hemorrhage, amenorrhea, self-mutilation by intentional cutting; Axis IV, problems with primary support group, problems with social environment and economic problems. Her GAF on admission was 25 and on discharge 65. (Tr. 477.)

On January 13, 2014, Plaintiff was evaluated by Tammy McDonald, LMHC, at the Oaklawn Psychiatric Center, an outpatient program. (Tr. 495-99.) She reported suicidal ideation, low energy, anhedonia, cognitive difficulties, poor sleep, episodes of derealization, isolating from others, being impulsive and harming others and herself due to poor decision-making. (Tr. 495.) Her mother also identified significant irritability and being manipulative. (*Id*.) Plaintiff denied current suicidal ideation, but "has had frequent thoughts of suicide in the past." (Tr. 497.) She "engaged in cutting starting a couple of months ago, with the last time being 1 week ago." (*Id*.) The diagnoses were: Axis I, Mood disorder, NOS; Cognitive disorder, NOS; Axis II, Borderline personality disorder; Axis III, history of brain hemorrhage in 2008; Axis IV, severe relational problems with mother; she had a GAF of 48. (Tr. 498-99.)

On January 27, 2014, Plaintiff admitted to self-harm and anger, where she punches the wall, and some recent hallucinations. (Tr. 517.) She was not successful in holding her only two jobs, one at 7-11 and another in a restaurant, where she was fired for being "too slow." (*Id*.) She had not been able to pass the driver's test. (*Id*.)

At the February 10, 2014 outpatient session, Plaintiff was seen by Timothy McFadden, M.D. (Tr. 510-15.) While she reported some improvement in her symptoms, her parents expressed concerns of increasing irritability and impulsiveness on the higher dosage of Effexor. (*Id*.) She was described as oppositional, argumentative, making poor decisions and being sexually

impulsive. (Tr. 511.) On mental status exam, her affect was angry, and sometimes labile. (Tr. 512.) Her judgment was questionable based on comments about her parents and recent relationships. (*Id*.) Her medications were adjusted; she was to continue in the IMR intensive groups at Oaklawn. (Tr. 513-15.) Dr. McFadden confirmed previous diagnoses and rated her GAF as 45. (*Id.*)

On February 14, 2014, Plaintiff was admitted to Oaklawn Hospital "on 72-hour detention papers" filed by her psychiatrist, Dr. McFadden. (Tr. 490.) Her parents reported that she was agitated, exhibited significant mood swings with demands and threats, and texted her mother stating she would kill herself or harm her parents. (*Id*.) She was "extremely impulsive regarding relationships and ha[d] been exhibiting impaired judgment by posting nude pictures of herself on the internet." (*Id*.) She has "highly impulsive sexual behavior." (*Id*.) She had been depressed and both gained and lost weight. (Tr. 490.) She had both auditory/visual and gustatory hallucinations. (*Id*.) She denied any problems or knowing why she was hospitalized. (*Id*.) She later acknowledged mania of 8/10 severity, poor sleep, delusional symptoms, irritability and impulsiveness without considering consequences. (*Id*.) She had not taken her medication the last week due to lack of insurance coverage (*Id*.); she took her medication every other day to make it last longer. (Tr. 505)

On examination, her speech was mildly slurred. (Tr. 491.) Her mood was depressed, affect was blunted and cognitive functioning appeared mildly impaired. (*Id*.) She had fairly poor insight and was not a reliable reporter. (Tr. 493.) She was fairly isolated and non-compliant with medications. (*Id*.) Plaintiff's diagnoses were: Axis I, Mood disorder secondary to brain hemorrhage, bipolar type; Cognitive disorder; Axis II, Borderline personality disorder; Axis III,

history of seizure secondary to brain hemorrhage, status post VP shunt placement, and history of brain hemorrhage; GAF on admission was 17. (Tr. 492-93.) On February 18, she was discharged from the hospital and was "court committed to treatment for 90 days as an outpatient with the authority to medicate." (Tr. 525.) She was prescribed Abilify, Vistaril and Effexor, and would receive the next Abilify Maintena injection in March. (*Id*.) Her GAF was 35. (*Id*.)

On March 3, 2014, Plaintiff saw Dr. McFadden (Tr. 543-47) and reported fatigue, blurred vision, low energy and fair appetite (Tr. 545). Affect was somewhat blunted and she appeared slightly drowsy. (*Id*.) She minimized her prior mood symptoms and conflict with her mother. (*Id*.) The same medications were continued; her current GAF was 40. (Tr. 547.) When Plaintiff returned to Dr. McFadden on March 31, 2014, she complained of several Abilify side effects, most notably was restlessness. (Tr. 539.) However, her report of severe side effects was incongruent with her pleasant affect. (Tr. 540.)

On April 25, 2014, Plaintiff complained of side effects from the Abilify injection and was struggling to manage. (Tr. 534.) She admitted having low mood and difficulty motivating herself to go to school. (*Id*.) Mental status was normal (Tr. 535.) Dr. McFadden decided to request an extension of her commitment out of concern that, without it, she would not be "compliant and she would be at high risk for impulsive and high-risk behavior again." (*Id*.)

On June 12, 2014, Plaintiff was admitted again at Oaklawn Hospital. (Tr. 485-519.) She was suicidal with thoughts of overdosing or walking into traffic. (Tr. 485.) She reported being "extremely depressed and overwhelmed" (*Id*.) She reported that her parents "kicked her out of their home" (*Id*.), but other information suggested she chose to leave (Tr. 500). Her mood was depressed and affect was congruent; cognitive functioning was mildly impaired. (*Id*.) She was

unkempt and had "fairly blunted affect." (Tr. 501.) She had been engaging in self-harm, using a needle to "rip up the skin," then picking at the scabs to make herself bleed. (Tr. 500.) The admission diagnoses were the same as in the prior admission, with one exception: A "history of past noncompliance" was added under Axis I. (Tr. 487-88, 503.) The GAF on admission was 15. (*Id.*) It was noted that Plaintiff suffers from significant mood instability, has a history of being impulsive and has had poor judgment in relationships since her injury. (Tr. 488.) On June 16, 2014, she was discharged with a GAF score of 33. (Tr. 521.) Her medications included Effexor 112.5mg, Mirtazapine 15mg, and injections of Abilify Maintena 300mg every four weeks. (Tr. 520.)

On June 27, 2014, at her post-inpatient visit with Dr. McFadden, Plaintiff was restless, "bouncing one knee during the interview." (Tr. 529.) While she reported "doing very well," Dr. McFadden noted that she "[t]ends to minimize any problems," and that her deficits in judgment and in processing speed are likely permanent. (*Id.*) Plaintiff reported taking Effexor, but not mirtazapine because she did not receive the prescription. (*Id.*) She was one week late for her Abilify injection. (*Id.*) One-on-one IMR intensive skills training was recommended due to her difficulty with boundaries in a group setting. (*Id.*) Dr. McFadden noted that she continued to lack judgment and has poor concentration. (Tr. 530.) Her medications were adjusted again, and she was provided with a sample injection of Abilify "because she has no money." (*Id.*) She was encouraged to apply for disability and to return to her parents' home. (*Id.*)

On September 6, 2014, Plaintiff saw Dr. Gupta for a physical consultative evaluation. (Tr. 548-51.) She reported a history of five brain surgeries secondary to the 2008 hemorrhage, headaches and dizziness. (*Id.*) She complained of pain, spasms and numbness in the left

extremities, and loss of balance when on her feet for long periods. (Tr. 548.) She walked with an ankle-foot orthosis on her left leg prescribed by her doctor for drop foot; she had a "slight limping gait." (Tr. 551.) Physical examination showed numbness, pain and weakness in the left lower extremity with drop foot and reduced strength of 4/5. (*Id.*) She could stoop and squat with difficulty. (*Id.*) She had numbness and weakness in the left arm, with reduced strength of 4/5 and reduced grip strength. (Tr. 550-51.)

When Plaintiff returned to Dr. McFadden on December 12, 2014, she reported ongoing struggle with low mood, low energy and negative thoughts; her PHQ-92 screen was 26 yet she reported being only "kind of depressed." (Tr. 559.) Her mother reported that she was shoplifting and had signed her father's name on a student loan report. (*Id.*) Dr. McFadden opined that these actions were "consistent with frontal lobe dysfunction in regards to executive decision making." (Tr. 560.) Dr. McFadden opined that Plaintiff should not move into the Oaklawn apartments because she needs more structure than the apartments could provide. (*Id.*)

In January 2015, Plaintiff continued receiving intramuscular Abilify Maintena 300mg every four weeks (Tr. 785.) Her insurance denied coverage for the injections; however, Dr. McFadden maintained her with samples. (Tr. 530, 781.) She had a GAF of 43. (Tr. 782, 787.) On January 26, 2015, Plaintiff reported possible seizure symptoms. (Tr. 783.)

On March 11, 2015, Dr. McFadden, a LCSW and two behavioral health professionals conducted a clinical reassessment. (Tr. 763.) They identified barriers to achieving goals: mood instability, physical aggression, impulsivity, isolation, low energy, low motivation, fatigue, anhedonia, poor sleep, and suicidal ideation, "all of which make it difficult for Sara to interact well with others and keep herself and others safe." (*Id.*) The diagnoses were: Axis I, Mood

disorder, NOS; Cognitive disorder, NOS; Axis II, Borderline personality disorder; Axis III, history of brain hemorrhage in 2008; Axis IV, severe relational problems with mother; she had a current GAF of 48 and was compliant with treatment at that time. (Tr. 762-63.)

On June 5, 2015. Plaintiff reported to Dr. McFadden that she was doing "okay" despite having frequent mood swings. (Tr. 741.) Her sleep and energy were fair. (*Id*.) Her skills training was discontinued because she was not acquiring new skills. (Tr. 742.) She planned to start vocational rehabilitation services the following week. (*Id*.) GAF was 48. (Tr. 743.)

On August 3, 2015, Plaintiff reported that her mood was stable. (Tr. 724.) She had recently been seen at Elkhart Clinic, diagnosed with partial seizures, and started on Lamictal, but she self-discontinued the medication due to nausea. (*Id*.) Her mental status was normal, and Dr. McFadden noted that Plaintiff reported functioning very well; however, he could not rule out "the fact that she is minimizing her symptoms." (Tr. 725.) She had a GAF of 48. (Tr. 726.)

On August 28, 2015, she presented for her Abilify Maintena 300mg injection and was one month overdue. (Tr. 718-19.) She had not received her July injection. (Tr. 719). On October 6, 2015, she presented for her Abilify Maintena 300mg injection, one week overdue. (Tr. 707.)

On October 13, 2015, Plaintiff underwent a neurological assessment at the request of Vocational Rehabilitation to determine her ability to "become a safe, independent driver." (Tr. 644.) She had coordination deficits. (Tr. 646.) Her driving reaction time showed moderate risk and her demonstrated driving and driving history both showed high risk. (Tr. 647.)

On November 12, 2015, Plaintiff told Dr. McFadden of difficulties with her parents, struggling in her classes and getting C's in two classes. (Tr. 570-71.) Her motivation was low and concentration was poor. (*Id*.) Her overall affect was blunted. (*Id*.) Her GAF was 43. (Tr. 573.)

On December 11, 2015, she reported moving to South Bend, requested discontinuation of individual therapy sessions, and transfer of her medication management to Oaklawn's South Bend office. (Tr. 704.) She continued receiving Abilify Maintena 300mg IM every four weeks. (Tr. 785.)

On October 7, 2016, Plaintiff participated in a neurovocational evaluation, conducted by Summer Ibarra, Ph. D., at the request of Vocational Rehabilitation. (Tr. 678-87.) Dr. Ibarra noted Plaintiff's current challenges as residual cognitive difficulties in several areas, moderate- to-severe mood dysregulation, report of numbness and weakness in her left extremities, need for family brain injury education and inability to drive independently. (Tr. 678.) Plaintiff's mood was dysphoric with a flat affect. (Tr. 680.) Her social interactions were appropriate yet reserved. (*Id*.) On testing, she had a Full Scale IQ of 100. (*Id.*) Testing of attention and concentration revealed some difficulties with sustained attention; she had increased errors suggestive of inattention. (Tr. 781.) While her processing speed was technically in the average range, it was slower than in premorbid functioning. (*Id*.) Mental arithmetic, a measure of working memory skills, was below expectations and fell in the low average to borderline impaired range. (*Id*.) The examination of gross motor speed found "moderately impaired performances bilaterally." (*Id*.)

Plaintiff's psychological functioning revealed moderate levels of depressive symptoms including extreme levels of fatigue, disturbed sleep, difficulty concentrating, and mildly low mood. (Tr. 681.) In addition to depression, she suffers from moderate-to-severe levels of anxiety and demonstrates both dependent and masochistic personality and behavioral tendencies. (Tr. 682.) The Mayo-Portland Adaptability Inventory (a measure of disability where higher scores represent greater disability) showed Plaintiff experiences mild-to-moderate level of disability in

all three areas of functioning. (*Id.*) She appears "most disabled in the area of psychosocial functioning relative to her overall physical and cognitive abilities and participation in the community." (*Id.*) Plaintiff still did not have a driver's license despite participating in rehabilitation driving training. (*Id.*) It was "not recommended that she was ready to return to independent driving secondary to her significant distractibility while operating a vehicle." (*Id.*) Plaintiff's strengths are her verbal, visual-spatial and novel problem-solving skills. (Tr. 683.) Her vocational barriers include (1) difficulties in attention and organization; (2) significant mood dysregulation that, in combination with her executive dysfunction, can lead her to engage in impulsive behaviors; and (3) continued numbness and weakness in her left extremities. (Tr. 684.) Dr. Ibarra recommended a comprehensive brain injury physiatry evaluation. (*Id.*)

On January 6, 2017, Plaintiff saw Mary McMahon, M.D., for muscle soreness in arms and legs, weight loss and increased headaches. (Tr. 689.) X-rays of the skull, chest and abdomen were normal. (Tr. 692.) A brain CT scan revealed stable findings. (Tr. 693.)

On January 23, 2017, Plaintiff was evaluated by Heather Kista, M.D., at the request of Dr. McMahon, for left frontal headaches lasting a few hours three to four times per week, which resolve when she lies down and sleeps. (Tr. 699.) The headaches are associated with photophobia, phonophobia and nausea. (*Id.*) She reported left arm soreness, numbness and heaviness, and difficulty descending stairs leading with her left leg. (*Id.*) Plaintiff also reported difficulty in concentration, increased forgetfulness and short-term memory loss over the past two months. (*Id.*) The examination revealed a spastic left ankle and decreased sensation to light touch on the sole of the left foot. (Tr. 700.) Reflexes were reduced on the left side. (Id.) Dr. Kista ordered testing. (*Id.*) At the February visit, Dr. Kista discussed the results of the testing, noting that the shunt was at the

lowest possible setting, which could cause low pressure headaches (Tr. 697.) When Plaintiff reported resolution of the headaches, Dr. Kista deferred adjustment of the shunt pressure (*Id*.)

On March 8, 2017, Plaintiff underwent a physical medicine rehabilitation consultation with Dr. Patel at Dr. Kista's request. (Tr. 694-96.) She reported left hand numbness and tingling, worst at night, and difficulty sleeping. (Tr. 694.) Fatigue was her primary concern, although the issues with the left hand and fatigue had bothered her for one year. (*Id*.) The 11-point system review revealed many issues, including: fatigue, loss of coordination, memory loss, paresthesias, focal weakness, anxiety, decreased attention span and sleeping difficulties. (*Id*.) Physical examination showed: on the left, elbow flexion 4+/5, wrist extension 4/5, and grip and intrinsics 4/5. (Tr. 694.) The left lower extremity had 1/5 with ankle dorsiflexion, extensor hallucis longus and ankle plantar flexion. (*Id*.) On the Modified Ashworth Scale (MAS), she had 1+/4 for the left biceps and left gastroc. (Tr. 694-95.) The Phalen's sign was positive on the left. (Tr. 695.) Dr. Patel noted a slightly antalgic gait with a flat foot instead of proper heel strike movement and pattern. (*Id*.) Her sensation is diminished "in the entire left side of her body and face." (*Id*.) Dr. Patel's impressions were: (1) traumatic brain injury, (2) spasticity of left biceps and a left gastric soleus complex, (3) left carpal tunnel syndrome, (4) gait impairments, and (5) fatigue. (*Id*.)

Plaintiff completed a Function Report - Adult on September 8, 2014. (Tr. 237-44.) On September 1, 2014, Plaintiff's mother completed a Function Report-Adult-Third Party. (Tr. 228-35.) On November 20, 2014, Plaintiff's father completed a Function Report-Adult-Third Party. (Tr. 249-56.)

On October 27, 2014, F. Kladder, Ph.D., a psychological consultant, issued an initial determination finding that Plaintiff had severe impairments: central nervous system, organic

mental disorders, anxiety and affective disorders. (Tr. 103.) Because the conditions resulted in marked restrictions in social functioning and maintaining concentration, persistence or pace, they "medically equal[ed Listing] 12.02AB in that we only have a dx (diagnosis) of cognitive d/o (disorder) nos" (Tr. 104.) The established onset date was July 16, 2014. (Tr. 107.)

A review by the Office of Quality Review (OQR) led to a different conclusion (Tr. 108-21). The reviewer added Personality Disorders as a severe impairment but did not find disability at Step 3. (Tr. 113.) Instead, it included a Residual Functional Capacity (RFC) for sedentary work with non-exertional restrictions and found Plaintiff could perform other work. (Tr. 115-21.)

On February 9, 2015, State agency medical and psychological consultants affirmed the OQR initial determination, with a slight revision in the "B Criteria" rating. (Tr. 127.) They again concluded that Plaintiff could perform other work in the national economy. (Tr. 133-34.)

At the hearing before the ALJ, Plaintiff testified that she continues to live with her parents. (Tr. 61.) She has been unable to pass her driving test due to issues with concentration and getting distracted easily. (Tr. 62.) College was very difficult; it took her five years to graduate. (Tr. 63.) Plaintiff testified that she has been unable to keep a job due to being easily distracted, fatigue, concentration and pain. (Tr. 63-64.) She was unable to complete a manager training program at Sherwin Williams due to fatigue. (Tr. 66.) Her work has all been on a part-time basis and for short periods. (Tr. 65- 66.) Fatigue has been a major factor in her inability to keep jobs. (Tr. 68.) Her tasks took her much longer than her coworkers to complete. (Tr. 72.) Her doctors believe the fatigue is due to residual weakness from her brain injury. (Tr. 68.) She tires very easily so being on her feet for extended periods is exhausting. (Tr. 72.) She last saw a psychiatrist in August 2015 and was not taking any psychiatric medications currently. (Tr. 68.) She testified that

she felt worse when taking the medications and had side effects, including headaches and stomach problems. (Tr. 73.) However, her mood still has been out of control, "angry, and then happy, and just kind of back and forth." (Tr. 74.) She stopped seeing Dr. McFadden because she did not believe she "had that big of an issue as he was indicating," but now agrees she has those problems. (Tr. 78.) Plaintiff was recently prescribed physical therapy and an antidepressant for nerve pain. (Tr. 69.)

She testified that, while she can do housework, it takes her a lot longer than her other family members. (Tr. 70.) She will become exhausted cleaning a bathroom and need to take a break. (Tr. 75-76.) When shopping at the store, she becomes distracted very easily and will buy things impulsively. (Tr. 70.) It takes her a long time to get through the grocery store. (*Id.*) If she is at work, she will start one task and then jump to another, forgetting about the first task. (Tr. 75.) Plaintiff becomes restless very easily when sitting or standing. (Tr. 72.) She will need to move around. (*Id.*) She has difficulty falling asleep because her "brain won't shut off." (Tr. 76.)

Plaintiff's mother testified that Plaintiff has difficulty focusing and fails to finish her tasks. (*Id.*) College was difficult for Plaintiff and required her parents go to the school and meet with staff and teachers many times. (*Id.*) She had accommodations, such as extra time for testing, and re-taking of tests. (*Id.*) Plaintiff was unable to live independently on campus; she moved in and out of her parents' home several times, the last time returning with bills and pending collection proceedings. (Tr. 81.) She had difficulty tolerating roommates and complained they took advantage of her. (Tr. 84.) Plaintiff tried working at her father's convenience store, but was unable to handle money, got distracted, and complained of being tired. (Tr. 84-85.) She spends money she does not have and has difficulty calculating change; she cannot handle a checkbook.

(Tr. 83.) Plaintiff has one friend who visits her, but Plaintiff does not go out. (Tr. 87.)

At the hearing, Dr. Michael Carney, Psychological Expert, outlined Plaintiff's impairments as follows: major depressive disorder, cognitive disorder secondary to the hemorrhagic stroke, NOS, borderline personality disorder and mood disorder. (Tr. 89.) Dr. Carney identified abnormal clinical findings in the record consistent with the "A Criteria" of Listings 12.02, 12.04 and 12.08. As to the "B Criteria," he opined that Plaintiff has mild impairment in understanding, remembering and applying information, and moderate impairment in interacting with others, concentration, persistence or pace, and managing self. (Tr. 91.) He stated that she is able to "function somewhat independently." (*Id*.) He opined that, "apart from the fatigue and some physical symptoms," Plaintiff can perform simple, repetitive tasks; however, she cannot do "paced work." (*Id*.) Dr. Carney stated he was "struggling with maybe occasional contact with the public. Given though the borderline personality disorder that was given to her, suggests that might be, might have problems with that." (Tr. 91-92.) In his opinion, Plaintiff can adapt to routine changes in her environment. (*Id*.) Dr. Carney again stated that his opinion did not take into consideration Plaintiff's fatigue. (*Id*.) Dr. Carney testified that he has not treated persons with traumatic brain injuries, and is not familiar with the problems with focus, concentration, mood changes typical in traumatic brain injury cases. (Tr. 94.)

The ALJ asked the VE to assume a hypothetical individual consistent with the ALJ's final residual functional capacity. (Tr. 96-97.) The VE testified that the individual could perform work as Order Clerk (DOT No. 567-014), Information Clerk (DOT No. 237.367-046), and "possibly some inspection jobs" (DOT No. 726.684-050). (Tr. 97.) The VE testified that an individual unable to maintain concentration and attention more than 80 percent of the time would be unable

23

to work. (Tr. 98.) The VE testified that an individual who missed two or more days per month would be unable to work. (Tr. 98.) The VE testified that it would not be acceptable to leave the job early on a chronic basis. (Tr. 98.)

The ALJ found that Plaintiff's (1) residuals of a cerebral vascular accident (CVA), (2) organic brain disorder, (3) depression, and (4) personality disorder were severe impairments (Step 2). (Tr. 37.) The ALJ found that Plaintiff's conditions neither met nor equaled a section in the Listing of Impairments (Step 3). (*Id*.) The ALJ found that Plaintiff had the residual functional capacity ("RFC") for light work, as defined in 20 C.F.R. § 416.967(b), except:

> [s]he can lift twenty pounds occasionally and ten pounds frequently. She can stand or walk two hours in an eight-hour workday. She can sit six hours in an eight-hour workday. She cannot climb ladders, ropes or scaffolds. She can perform all other postural maneuvers occasionally. The claimant is limited to simple, repetitive tasks with no hourly quotas, but she can do end-of-day quotas. She can have occasional contact with the general public. She can adapt to routine changes in the work environment.

(Tr. 40.) The ALJ found that Plaintiff has no past relevant work. (Step 4). (Tr. 44.) He concluded that she could perform other work that exists in the economy (Step 5). (Tr. 44-45.)

In support of remand, Plaintiff first argues that the ALJ's Step Three analysis is incomplete and unsupported. At Step Three, the ALJ considered Plaintiff's mental functioning as rated in the "B Criteria." The ALJ determined that Plaintiff had mild limitations in understanding, remembering, or applying information and in adapting or managing self, and further, that she has moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace. (Tr. 38- 39.)

Plaintiff argues that the ALJ's "B Criteria" analysis does not take into account critical objective evidence related to Plaintiff's mental functioning. For example, the ALJ did not factor

the documented clinical abnormalities. In his evaluation of the "B Criteria" the ALJ also failed to consider Plaintiff's GAF scores. Excluding the GAF scores at the times of her inpatient admissions-which were in the critical 15-25 range-all other GAF scores were severely low, consistently in the 40s: GAF of 40 (*see* Tr. 589), GAF of 43 (see Tr. 567, 573, 578, 584,774, 778, 782, 787) and GAF of 48 (*see* Tr. 592, 721, 726, 731, 733, 743, 745, 751, 755, 760, 763). Significantly, these scores were offered by Dr. McFadden, her treating psychiatrist, for the period of February 2014, when Plaintiff was first evaluated by Dr. McFadden (Tr. 510-15), through October 2015, when she moved to South Bend and requested transfer of her treatment to the Oaklawn facility there (Tr. 704). Thus, the ongoing treatment by Dr. McFadden during that period, and the consistency of the GAF scores, strongly suggest that they are a reliable reflection of her mental functioning and should have been factored in assessing the "B Criteria." They cannot simply be minimized, as the ALJ later stated in the RFC section, as "a non-standardized measure of symptom severity that capture the claimant's level of functioning or symptoms only at the time of the evaluation, as evidenced by the disparity of GAF scores contained in the record." (Tr. 43). Further, the results of Plaintiff's March 2015, psychiatric evaluation at Oaklawn (Tr. 762-63) were completely omitted from the ALJ's assessment of the "B Criteria." Dr. McFadden, a LCSW, and two behavioral health professionals conducted a clinical reassessment and found Plaintiff had significant barriers to achieving her goals, including: mood instability, physical aggression, impulsivity, isolation, low energy, low motivation, fatigue, anhedonia, poor sleep, and suicidal ideation, "all of which make it difficult for Sara to interact well with others and keep herself and others safe." (Tr. 763.)

     Plaintiff also argues that the ALJ did not consider Plaintiff's multiple treatment

management. Plaintiff has been prescribed, and complied with, multiple psychiatric medications. She participated in individual and group therapy sessions. Critically, she required four hospitalizations for mental health issues, which were not considered by the ALJ in the "B Criteria" assessment either. (*See* Tr. 289 (November 17 to 23, 2012 hospitalization for major depressive disorder, recurrent/severe, with suicidal ideation and gestures and cognitive disorder secondary to brain hemorrhage); Tr. 470 (December 13, 2013 to January 3, 2014 hospitalization for depression, anxiety and suicidal ideation with the intent and plan to overdose); Tr. 490 (February 13, 2014 72-hour psychiatric detention by Dr. McFadden for threats to kill herself or harm her parents); Tr. 485 (June 12 to 16, 2014 hospitalization for depression and suicidal ideation). On February 18, 2014, she was placed on a temporary 90-day outpatient commitment to services with the authority to medicate. (Tr. 524.) Dr. McFadden later extended the commitment out of concern that without it she would not be "compliant and she would be at high risk for impulsive and high-risk behavior again." (Tr. 535.)

These hospitalizations occurred within six months of Plaintiff filing her SSI claim in July 2014. While Title XVI/SSI claims do not provide for retroactive benefits, like Title II claims, this evidence is part of the longitudinal evaluation required in mental impairment cases. This is an entire line of evidence of Plaintiff's mental and physical impairments, favorable to the Plaintiff, that the ALJ failed to consider (Tr. 37-43). *See* 20 C.F.R. § 404.1520(a)(3) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled."). *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)) (ALJ obligated "to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that

points to a disability finding."); *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (ALJ need not provide a complete written evaluation of every piece of testimony and evidence, but failure to consider an entire line of evidence falls below the minimal level of articulation required).

Plaintiff argues that the ALJ did not account for Plaintiff's physical conditions in the "B Criteria" analysis. This is particularly critical here given the interrelatedness of Plaintiff's conditions, evident in Plaintiff's Axis III diagnoses, which are used "for reporting current general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder." DSM-IV-TR at 29. In this case, Plaintiff was diagnosed consistently with serious medical conditions on Axis III, including, a history of seizure secondary to brain hemorrhage in 2008, status post VP shunt placement and history of brain hemorrhage in 2008, elevated TSH, and late effects of intracranial injury. (*See, e.g.*, Tr. 289, 488, 498, 503, 641.) There can be little doubt that Plaintiff's physical conditions are directly related to, and impact, her mental functioning. Thus, the ALJ's failure to consider this evidence renders his "B Criteria" assessment unsupported.

Plaintiff also argues that the ALJ's "B Criteria" rating is inconsistent with the opinion rendered by Dr. Carney, the medical expert. The ALJ stated that he gave "great weight to" and "adopted his opinion" (Tr. 42.) Dr. Carney rated Plaintiff's ability to manage self as moderately restricted (Tr. 91), but the ALJ found only "mild" restriction in this factor. (Tr. 39.) The ALJ failed to explain why, after giving great weight to the medical expert's opinion, his rating differed from Dr. Carney's. Further, a closer inspection of the ALJ's support for his rating of this factor reveals that it was premised in great part on Plaintiff's daily activities, specifically: "she is able to perform household chores, self-care, and personal responsibilities without significant

modifications or adjustments necessitated by psychologically based symptoms or impairments.." (Tr. 39.) This is an insufficient, and inaccurate, analysis. First, the Seventh Circuit has held that an ALJ may not consider daily activities without looking at the qualifications inherent in those activities. *Thompson v. Berryhill*, 722 F. App'x 573, 582 (7th Cir. 2018); *Punzio*, 630 F.3d at 710; *Larson*, 615 F.3d at 751. In this case, while Plaintiff performs some activities, she cannot do so without difficulty or assistance. Plaintiff's qualifications are best detailed in several Function Reports in the record, which show that her activities are not performed independently, appropriately, or on a sustained basis. (See, e.g., Tr. 228-35, 237-44, 249-56).

Plaintiff contends that the ALJ's rationale for finding mild restrictions in managing self is contradicted by the record. Plaintiff needs reminders to take her medications. (Tr. 239.) While she can do household chores, it takes her longer than normal. (*Id.*) When she attempted to work, the tasks took her much longer to complete than her co-workers. (Tr. 72.) Plaintiff's mother reported that she fails to complete household chores and needs encouragement to do so. (Tr. 230.) Plaintiff's father stated that she requires extra time to do chores and the quality of her work "is not good." (Tr. 251.) Further, she does not complete tasks, quits easily and is distracted most of the time. (Tr. 254.) Plaintiff completed college, but it took her an additional year and she was provided with special accommodations, such as test retaking, longer time for tests, and assistance from Vocational Rehabilitation Services. (Tr. 63, 80, 85, 680.) While she was selected for a manager training program at Sherwin Williams, she was unable to complete it due to fatigue. (Tr. 66.) Plaintiff attempted to live independently on campus, but was unable to make it for more than a week. (Tr. 81.) Dr. McFadden recommended that she not live independently in an apartment at Oaklawn as she required the structure and guidance found in her parents' home. (Tr. 514.)

Neuropsychological testing in 2013 noted that she would have difficulty with autonomy and emancipation issues. (Tr. 780.) Her parents reported that she was shoplifting and had signed her father's name on a student loan report. (Tr. 559.) Dr. McFadden opined these actions were consistent with frontal lobe dysfunction in regard to executive decision-making. (Tr. 560.) These are all qualifications that the ALJ did not consider. Thus, the ALJ's assessment of mild restrictions in ability to manage self is contrary to Dr. Carney's assessment and the evidence. Consequently, it is unsupported.

Plaintiff has cited to a host of medical and other evidence showing that the ALJ's "B Criteria" assessment was not supported. The Commissioner, however, merely identifies what the ALJ considered. This response fails as the Seventh Circuit has held that considering only selective evidence is insufficient to uphold a decision. *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982) ("an ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion."); *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("the ALJ identified pieces of evidence in the record that supported her conclusion that Mr. Scrogham was not disabled, but she ignored related evidence that undermined her conclusion. This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

In the present case, the ALJ's selected evidence does not provide an accurate and logical bridge. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("We require that an ALJ build an 'accurate and logical bridge from the evidence to [his] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review.")) This is critical given the evidence the ALJ did not consider. For example, the ALJ failed to consider Plaintiff's

consistent, severely low GAF scores, critical findings from multiple psychiatric evaluations, Plaintiff's treatment history, Plaintiff's multiple treatment management, Plaintiff's hospitalizations, the interrelatedness of Plaintiff's conditions, and a host of other evidence.

Moreover, as noted, the ALJ failed to explain why he disagreed with Dr. Carney's opinion, after giving it great weight. In this case, Dr. Carney assigned Plaintiff moderate limitations in managing herself, but the ALJ assigned mild limitations. The ALJ does not address this inconsistency, despite well-settled precedent that an ALJ must explain why he does not credit evidence that would support a claim of disability, or why he concluded that such evidence is outweighed by other evidence. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007); *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001). The Commissioner's reliance on the fact that moderate limitations in managing herself, itself, would not result in meeting a listing is irrelevant. There are two independent considerations required at Step Three, meeting or equaling a listing, and further, proper "B Criteria" assessment impacts the RFC.

Moreover, the Commissioner, like the ALJ, focused on daily activities. The Decision focuses on absolutes of activities, not degrees. This is impermissible. Agency regulations require the ALJ to consider the degrees, not absolutes, of activities. *See* 20 C.F.R. § Pt. 404, Subpt. P., App. 1, § 12.00(F)(1) ("We will consider, for example, the kind, degree, and frequency of difficulty you would have"); *Id*. at § 12.00(F)(3)(d) (Agency will look to see how independently, appropriately, effectively, the activity is done and whether it is performed on a sustained basis). This has been emphasized in this Circuit—an ALJ may not consider daily activities, without looking at the qualifications inherent in those activities. *Thompson v. Berryhill*, 722 F. App'x at 582 (7th Cir. 2018); *Childress v. Colvin*, 845 F.3d 789, 792 (7th Cir. 2017). The record

demonstrates that there is no consistency in Plaintiff's activities because of her conditions. While Plaintiff may perform some activities, it is not without difficulty, assistance, redirection, or accommodations. (*Id*.) Thus, the ALJ's unsupported conclusions, and the Commissioner's mere recitation of them, without considering how independently, appropriately and effectively the activity is done, and whether it is performed on a sustained basis, cannot serve as substantial evidence and salvage the ALJ's critical errors.

The ALJ's failure to consider the relevant evidence with regards to the "B Criteria" demonstrates that the ALJ failed to fundamentally understand the facts in this case, Plaintiff's symptoms, and the interplay among the Listings at Step Three. The ALJ's Decision shows the ALJ's "all-too-common misunderstanding of mental illness," *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011), which warrants remand.

Next, Plaintiff argues that the ALJ failed to properly consider medical equivalence. Step Three requires two independent conclusions. First, the ALJ must determine whether a claimant's conditions individually meet or equal a listed impairment. *See* 20 C.F.R. § 404.1525. Second, the ALJ must determine whether the conditions, in combination, medically equal a listed impairment. *See* 20 C.F.R. § 404.1526. At the hearing, the ALJ elicited testimony from Dr. Carney on the "B Criteria" that would lead to the conclusion that Plaintiff's mental impairments do not meet Listings 12.02, 12,04, or 12.08. (Tr. 90-91.) However, the ALJ never asked Dr. Carney whether there was a 12-month period during which Plaintiff had greater limitations than those he proposed in his "B Criteria" assessment, an inquiry that could have shown listing level severity for some of the period at issue and could have supported a closed period of disability. Similarly, the ALJ never asked Dr. Carney whether the signs, symptoms and laboratory findings of all conditions, in

combination, medically equaled a listing at any time since the filing of the claim, nearly three years. This is an indispensable question for a medical expert, regardless of whether the expert testifies at a hearing or provides an opinion through written interrogatories.

On March 27, 2017, the Agency published SSR 17-2p, which rescinded and replaced SSR 96-6p, but affirmed long-standing Agency policy that an updated medical opinion is critical to the determination of medical equivalence. *See* SSR 17-2p, 2017 WL 3928306 (Mar. 27, 2017). Where an ALJ fails to support the Step Three conclusion with adequate medical opinions given the combination of all of Plaintiff's conditions and in light of the critical evidence not considered, remand is necessary. *Staggs v. Astrue*, 781 F. Supp. 2d 790, 795 (S.D. Ind. 2011) ("this case must be remanded to the Commissioner with instruction to obtain and consider an updated medical opinion regarding whether, based on all of the evidence in the Record, Staggs' severe impairments, singly or in combination, medically or functionally equal any of the Listings of Impairments."). Here, the ALJ's request to have a medical expert present to give testimony at the hearing is a tacit acknowledgement that Plaintiff's lengthy and complex medical history required an updated and complete expert medical opinion. However, that is not what resulted from the hearing. Instead, by failing to present the critical question of medical equivalence to the medical expert, the ALJ failed to elicit a complete, updated medical opinion to support a Step Three determination on medical equivalence. The ALJ's failure to present that crucial question to the medical expert renders the Step Three determination incomplete and unsupported.

Further, Dr. Carney's testimony cannot salvage the ALJ's errors at Step Three because he stated, on at least a couple of occasions, that he did not consider the impact of Plaintiff's complaints of fatigue when rendering an opinion. (Tr. 91-92.) The ALJ acknowledged this in his

Decision. (Tr. 43.) However, Plaintiff's fatigue is consistently documented in the record and an integral component of Plaintiff's claim for benefits. (Tr. 63-64, 68, 72, 75-76, 84-85, 545, 763, 681, 694, 699.) Failure to factor this well-documented symptom undermines the reliability of the medical expert's opinion. Moreover, Dr. Carney conceded that, in his practice, he has not treated people with traumatic brain injuries, such as the one Plaintiff suffered, nor is he familiar with the typical problems with focus, concentration, and mood changes that often are residuals of a traumatic brain injury. (Tr. 94.) This lack of subject-matter expertise about the nature, severity and residuals of traumatic brain injuries, like Plaintiff's, and the exclusion of documented fatigue when rendering his opinion, critically undermines the reliability of his testimony in Plaintiff's case. For these reasons, his testimony cannot salvage the ALJ's errors on medical equivalence, and the ALJ's decision at Step Three is incomplete and unsupported.

Further, the opinions of the State Agency medical and psychological consultants also cannot salvage the ALJ's errors as they, themselves, were critically out of date. *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018); *Moreno v. Berryhill*, 882 F.3d at 728 (7th Cir. 2018); *Thomas v. Colvin*, 826 F.3d 953 (7th Cir. 2016). In this case, the State Agency opinions dated October 2014 and December 2014 fail to consider subsequent evidence of persistent abnormalities. For example, the State agency medical and psychological consultants did not have the opportunity to consider Dr. McFadden's team evaluation at Oaklawn dated March 11, 2015 (Tr. 762-70); Dr. Ibarra's neurovocational consultation dated October 7, 2016 (Tr. 678-85); Dr. Patel's March 8, 2017 physical medicine rehabilitation consultation (Tr. 694-96); Oaklawn therapy session notes consistently documenting GAF scores ranging from 43 to 48 (Tr. 721, 726, 733, 743, 745, 751, 763, 774, 782, 787) and subsequent progress notes from other providers for the period through

February 2017 (Tr. 689-93, 697-701). All these records postdate the State Agency decisions. Thus, the State Agency's opinions cannot salvage the ALJ's decision. This is similar to the Seventh Circuit's remand in *Moreno v. Berryhill*, 882 F.3d 722 (7th Cir. 2018). In *Moreno*, the Seventh Circuit held that the State Agency opinions were outdated because there were abnormalities in new records which revealed "significant and new developments" that "bear directly" on the claimant's functioning. *Id*. at 728. The same is true here. In this case, these records reflect significant, persistent abnormalities and new developments not otherwise documented in the record. Thus, as in *Moreno*, because the State Agency did not consider any of these documented abnormalities, their opinions are out of date. Additionally, the State Agency opinions do not reflect a proper review of the evidence. Thus, for the foregoing reasons, the State Agency opinions cannot salvage the ALJ's errors.

Plaintiff has demonstrated that the ALJ's Decision failed with regards to the issue of medical equivalence. *Hartley v. Berryhill*, No. 1:17-cv-1043-TWP-TAB, 2018 WL 2173682, at *5 (S.D. Ind. May 10, 2018) ("the claimant's burden [at Step Three] is merely to produce evidence in support of the claim, not to prove equivalence.") (quoting *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008)). The Commissioner focuses on the meeting aspect of the listings. This is misplaced, as the true issue here is equivalence. Plaintiff demonstrated the ALJ failed to consider medical equivalence given the combination of Plaintiff's conditions. The Commissioner attempts to explain this away by asserting that Plaintiff's earnings would have made her ineligible. However, this was not the ALJ's rationale. *Chenery*, 318 U.S. at 87-88. The ALJ never addressed it. Nor does the Commissioner provide any support aside from the conclusory speculation that she "likely improved." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 125 (7th

Cir. 2000) (speculation is not substantial evidence). Nor does this response address the errors with regards to the ALJ's medical analysis, separate from the eligibility analysis.

For the reasons stated above, the ALJ's Step Three conclusions do not pass scrutiny. *See, e.g., Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (remanding for a "more thorough analysis" of Step 3 because the ALJ's failure "to evaluate any of the evidence that potentially supported Ribaudo's claim does not provide much assurance that he adequately considered Ribaudo's case."). The Commissioner fails to present a justifiable basis for affirming given Plaintiff's factual and legal support. Remand is necessary to address the individual and cumulative errors in the ALJ's Step Three conclusion.

Next, Plaintiff argues that the ALJ erred in crafting the RFC. Plaintiff first argues that the RFC does not accommodate Plaintiff's deficits in interacting with others, and in maintaining concentration, persistence or pace. As noted above, the ALJ's failure to consider all of the evidence in assessing the "B Criteria" resulted in a flawed Step Three determination. This error affected the remainder of the Decision, especially the RFC determination. However, even assuming, *arguendo*, that moderate limitations were supported in the second and third "B Criteria" factors, the ALJ's RFC still fails to accommodate those moderate limitations. Specifically, the ALJ limited Plaintiff to: "simple repetitive tasks with no hourly quotas but she can do end-of-day quotas. She can have occasional contact with the general public. She can adapt to routine changes in the work environment." (Tr. 40.) Plaintiff argues that this mental RFC is deficient.

The ALJ's conclusion that Plaintiff "can have occasional contact with the general public" does not accommodate the "B Criteria" moderate restrictions in Interacting with others. Under 20

35

C.F.R. § 416.921(b), basic mental work activities include, inter alia, use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. The ALJ's RFC mentions only the contact with the general public but is silent regarding the other workplace interactions (*i.e.*, co-workers and supervisors) that the regulations define as basic mental work activities. Having found moderate restrictions in interacting with others in the "B Criteria" assessment, the ALJ was required to address Plaintiff's ability to respond to, and interact with, co-workers and supervisors. Thus, the mental RFC is incomplete.

The RFC's silence in this regard undermines the RFC's supportability because this record shows that Plaintiff does not interact well with others, including supervisors. Critically, she was fired from a job because she could not get along with her boss, who thought she was "too slow." (Tr. 243.) Further, Plaintiff was diagnosed with borderline personality disorder in 2014 (Tr. 477), but in 2009, the records suggested personality changes secondary to her cerebrovascular accident. (Tr. 290, 347, 641.) She demonstrates both dependent and masochistic personality and behavioral tendencies. (Tr. 682.) She is extremely impulsive, demonstrates disinhibition and has exhibited impaired judgment by posting nude pictures of herself online. (Tr. 490, 495, 641, 608.) Plaintiff has "significant mood instability" and has "significantly strained relationship with her parents and family members" since her brain injury (Tr. 488.) She is demanding and threatening; her text telling her mother that she would kill herself or harm her parents led Dr. McFadden, her psychiatrist, to seek a court-ordered 72-hour detention. (Tr. 490.) Dr. McFadden opined that Plaintiff has mood instability, physical aggression, impulsivity, isolation, low energy, low motivation, fatigue, anhedonia, poor sleep and suicidal ideation, "all of which make it difficult for

Sara to interact well with others and keep herself and others safe." (Tr. 763.) She has frequent irritability, accompanied with verbal and physical aggression, intense anger and difficulty controlling her anger. (Tr. 497, 517.) She is oppositional and argumentative. (Tr. 510.) For example, Plaintiff was suspended from college for one semester after vandalizing a student's property. (Tr. 470.) She was the subject of a restraining order. (Tr. 486.) When she tried to live on campus, she was highly intrusive with peers and disruptive in the dormitory. (Tr. 510-11.) Plaintiff was removed from the IMR intensive programming at Oaklawn due to inappropriate boundaries with one of her peers. (Tr. 520.) In light of this evidence, the ALJ's failure to define the nature and frequency of contact with co-workers and supervisors results in an incomplete RFC determination. Consequently, the ALJ's RFC is not a reflection of the most Plaintiff can do under SSR 96-8p.

Similarly, the ALJ's conclusion that Plaintiff can perform "simple repetitive tasks with no hourly quotas but can do end-of-day quotas" does not fully accommodate moderate deficits in concentration, persistence or pace. *See, e.g., Moreno*, 882 F.3d at 730 (refuting Commissioner's claim that "the ALJ's reference to simple work instructions and to routine, low-stress work 'reasonably accommodated Moreno's moderate difficulties in concentration, persistence or pace.' We cannot accept this argument. '[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.'"); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). This is most critical here due to a substantial body of evidence documenting Plaintiff's deficits in concentration, persistence or pace such that restricting her to "simple, repetitive tasks with no hourly quotas" is insufficient.

Here the record demonstrates poor concentration (Tr. 530, 571); organizational difficulties, slowed processing speed (Tr. 608); sustained attention problems (Tr. 608, 681, 683, 699); significant distractibility (Tr. 682); and decreased attention span. (Tr. 694.) Thus, the ALJ's RFC assessment fails to accommodate Plaintiff's limitations.

Moreover, courts have repeatedly held that the ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity. *See, e.g., Stewart*, 561 F.3d at 684-85; *Craft*, 539 F.3d at 677; *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); see also SSR 85-15, 1985 WL 56857 (Jan. 1, 1985) ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job."). Notwithstanding this well-settled, controlling precedent, the ALJ failed to properly account for Plaintiff's deficiencies in concentration, persistence or pace in his Decision given the evidence noted herein. For example, in the 2013 neuropsychological evaluation her "memory is consistently impaired on testing" and there is impairment in executive functioning tests; motor speed is slow bilaterally (Tr. 640) In the October 2015 neuro evaluation, she showed coordination deficits. (Tr. 646.) Despite training, she could not drive independently due to "significant distractibility while operating a vehicle." (Tr. 682.) Plaintiff has slow processing speed and sustained attention and concentration problems. (Tr. 347, 530, 571, 608, 610, 638, 781). Plaintiff completed her bachelor's degree in five years, but needed the assistance of Vocational Rehabilitation Services and significant special accommodations. (Tr. 680) Despite this, she reported struggling in her classes and getting C's in two classes. (Tr. 571.) Her

motivation was low and concentration was poor. (Id.) She received ongoing skills training. (*Id*.) The record amply demonstrates Plaintiff's significant and persistent issues with concentration, persistence and pace such that limiting her to just simple, repetitive work does not account for the moderate restrictions in the "B Criteria."

The ALJ also failed to properly account for Plaintiff's ability to accommodate to the stress and demands of work and work-like settings. In this regard, SSR 85-15 is instructive:

> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.

> Thus, the mentally impaired may have difficulty meeting the requirement of even so-called "low stress" jobs.

*See* SSR 85-15, 1985 WL 56857, at *6. Thus, "any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment." (*Id*.) This is most critical given the evidence related to Plaintiff's inability to handle stress and changes. Plaintiff has a history of four psychiatric hospitalizations due to suicidal ideation with a plan (Tr. 289, 470, 485, 490) and self-mutilation by cutting (Tr. 475). Plaintiff and those close to her report that she does not handle stress or changes well. (Tr. 234, 243, 255.) The ALJ's failure to accommodate for stress in the RFC contravenes Agency policy embodied in SSR 85-15. Because the RFC does not accommodate Plaintiff's deficits in interacting with others and maintaining concentration, persistence or pace, the ALJ failed to build an accurate and logical bridge between the evidence and his RFC determination.

In response, the Commissioner did not even attempt to show that the State Agency

opinions were supported, rather, he focuses on Dr. Carney's testimony. However, the Commissioner even acknowledged that this testimony was not based on a complete picture given Dr. Carney's failure to consider Plaintiff's fatigue.

A non-examining, expert medical opinion based on review of a claimant's incomplete medical history does not offer a basis to find the substantial evidence necessary to uphold an ALJ's decision in a disability determination. *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996); *see also* 20 C.F.R. § 404.1527(c) (a medical opinion must be considered given its supportability, consistency, and specialization). Dr. Carney's opinion cannot save the ALJ's Decision given that his opinion omitted critical information about Plaintiff's fatigue, which is highly relevant to her disability claim, and his unfamiliarity with Plaintiff's condition and the treatments involved. The Commissioner asserts that Dr. Carney's opinion did not need to incorporate Plaintiff's fatigue because Plaintiff "only required" melatonin. This is unpersuasive. First, melatonin was recommended because she could not take the stronger medications (e.g., Ritalin, Elavil, and Trazodone) due to the side effects. (Tr. 695.) Thus, the Commissioner's attempt to minimize Plaintiff's fatigue because she was only prescribed melatonin ignores the fact that she needed other stronger medications but could not take them. This shows a condition which necessitated further treatment but was unavailable to the claimant. *See e.g.*, SSR 16-3p (we must consider the individual's treatment history and explanations, including that "[a]n individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms."). Moreover, despite her treatment, Plaintiff testified at the hearing that she still suffered from fatigue and that it was a major symptom.

The more pressing issue, however, is that an ALJ's reliance on inaccurate or incomplete

40

testimony of an ME is reversible error. *Bridges v. Comm'r of Soc. Sec.*, 278 F.Supp.2d 797, 804-05 (N.D. Tex. July 29, 2003) (remanding where the medical expert failed to consider two of Plaintiff's conditions when submitting his opinion); explaining that outdated and incomplete medical opinions cannot serve as substantial evidence given the Seventh Circuit's holdings in *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018), *Moreno v. Berryhill*, 882 F.3d at 728 (7th Cir. 2018), and *Thomas v. Colvin*, 826 F.3d 953 (7th Cir. 2016)); *Etter v. Colvin*, 1:16-cv-406-JMS-MJD, 2017 WL 661528, at *8 (S.D. Ind. Feb. 17, 2017) (incomplete medical expert testimony cannot serve as substantial evidence).

Despite the Commissioner's characterization of the RFC, Plaintiff demonstrated that it was still insufficient in key respects. There is evidence that contradicts the ALJ's RFC, such that remand is warranted, akin to *Moren*o, 882 F.3d at 730, *O'Connor-Spinner*, 627 F.3d at 620, *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009), *Craft*, 539 F.3d at 677-78, *DeCamp v. Berryhill*, 916 F.3d 671, 2019 WL 923692, at *4 (7th Cir. 2019), and *Radosevich v. Berryhill*, 759 F. App'x 492, 494-95 (7th Cir. 2019). Moreover, the ALJ's RFC does not account for Plaintiff's inability to accommodate to the stress and demands of work and work-like settings. As the Agency has explained in SSR 85-15:

> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirement of even so-called "low stress" jobs.
>
> A claimant's condition may make performance of an unskilled job as difficult as an

objectively more demanding job, for example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demand of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may be not able to work even in the absence of close supervision; the knowledge that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerated for some mentally impaired persons. Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment

*See* SSR 85-15, 1985 WL 56857, at *6. This ruling is most relevant in this case given the pervasive evidence in the record regarding Plaintiff's inability to handle stress and changes.

The Commissioner asserts that the ALJ accounted for Plaintiff's inability to handle stress by limiting Plaintiff to simple, routine, and repetitive tasks with no hourly quotas (although required to meet end-of-day quotas).This does not pass scrutiny. First, as the Seventh Circuit has held, "the Commissioner has not cited, nor have we found, any authority supporting the ALJ's speculation that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including, as part of the claimant's mental residual functional capacity, a moderate limitation on concentration, persistence, and pace." *O'Connor-Spinner*, 832 F.3d at 698. Second, as noted in SSR 85-15, stress is not properly accommodated in limitations in pace, because stress is highly individual and a pace restriction does not account for Plaintiff's four psychiatric hospitalizations or self-mutilation by cutting, or overall deficits.  Nor does it account for her distraction and required redirection. (Tr. 242.) This is relevant because of the evidence addressing Plaintiff's need for assistance and redirection. (See, e.g., Tr. 228-35, 237-44, 249-56). The RFC does not address Plaintiff's inability to (1) perform a task without redirection, (2) tolerate being supervised, (3) adapt to her work being judged, or (4) handle the demands of getting to work

regularly and remaining in the workplace for a full day. As such, remand is warranted.

For similar reasons, the ALJ's RFC's limitation to "occasional contact with the general public" is flawed. First, the evidence simply does not support the ALJ's limitation. Second, the ALJ's limitation does not account for Plaintiff's interactions with supervisors who must, by necessity, provide employees with instructions and criticism, as part of any employment. *See* SSR 85-15. Third, there is no logical bridge to support that she can only occasionally interact with the public, but yet retain perfect abilities to interact with co-workers and supervisors. Thus, the ALJ's restriction fails to account for Plaintiff's deficits.

The ALJ's RFC as it relates to Plaintiff's mental limitations is not supported by the facts or the law. Therefore, remand is necessary for a proper determination of Plaintiff's RFC. This error also warrants remand for a proper determination at Step Five. *Varga*, 794 F.3d at 813 ("in this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record"). In failing to properly consider the evidence, the ALJ failed to present the VE with a hypothetical that incorporates all of the limitations. Accordingly, remand is necessary.

Next, Plaintiff argues that the ALJ erred in assessing Plaintiff's statements. A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Here, the ALJ determined that Plaintiff's symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 41.) Given the facts in this case, this is not a proper credibility determination. *See* SSR 96-8p, 1996 WL 374184 at *5 ("Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more

severe limitations or restrictions than can be shown by objective medical evidence alone.").

First, the ALJ's focus on objective medical evidence is misplaced. While the ALJ did review some medical evidence, the objective findings cannot serve as a basis for dismissing Plaintiff's statements. Second, the ALJ's use of selective objective evidence to suggest that Plaintiff's symptoms are uncorroborated, is itself unsupported. *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) (ALJ erroneously believed that "complaints of pain, to be credible, must be confirmed by diagnostic tests."). The ALJ failed to properly analyze and discuss the abnormal findings from Plaintiff's exams, all of which support Plaintiff's statements; thus, highlighting only normal findings cannot serve as substantial evidence. Third, pain is not measured on objective testing. *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("Pain is always subjective."). Fourth, the ALJ did not address any of other evidence corroborating Plaintiff's symptoms. Thus, the medical evidence the ALJ reviewed cannot discredit the Plaintiff.

Relatedly, the ALJ erred in minimizing Plaintiff's statements due to what the ALJ deemed "sporadic, routine and conservative treatment." (Tr. 42.) The ALJ did not consider any of the possible explanations documented in the record which shed light on Plaintiff's treatment history. The ALJ's failure to consider this evidence before dismissing Plaintiff's statements and conditions is reversible error. An ALJ may not "draw inferences about an individual's symptoms and their functional effects from a failure to seek treatment without first considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996). Although SSR 96-7p was rescinded and replaced by SSR 16-3p in March 2016, the Agency still maintains that there are many possible reasons an individual may not have pursued treatment, and that the ALJ "will" consider and address a claimant's reasons for not pursuing treatment. *See* SSR 16-3p, 2017

44

WL 5180304, at *9-10 (Oct. 25, 2017). The ALJ here did not consider any explanations relevant to this determination. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011).

Plaintiff suffers from diagnosed mental illness, which required extensive professional intervention. "Many individuals with mental health problems are hesitant to seek mental health treatment for legitimate reasons." *Hill v. Astrue*, No. 1:08-cv-0740-DFH-JMS, 2009 WL 426048, at *9 n. 5 (S.D. Ind. Feb. 20, 2009). "[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). The ALJ failed to consider that Plaintiff's mental illness may play a part in her treatment. Plaintiff exhibits poor decision making (Tr. 497, 510) and poor to impaired judgment. (Tr. 530, 535.) She lacks insight about her difficulties. (Tr. 529.) In 2014, Plaintiff was placed on a court-ordered 90-day outpatient commitment (Tr. 524), which was extended due to the concern that, without it, she would not be compliant and at high risk for impulsive and high-risk behavior (Tr. 535). In 2015, she received her Abilify injections late on multiple occasions. (Tr. 707, 718-19.) She stopped seeing Dr. McFadden in part because she did not believe she had "that big of an issue as he was indicating." (Tr. 78.) Dr. McFadden opined that "in all likelihood, her deficits in judgment, and in processing speed, will be permanent." (Tr. 529.) Plaintiff's mental illness clearly plays a role in her difficulty obtaining and maintaining treatment. The same is true for Plaintiff's physical conditions. Axis III is used "for reporting current general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder." DSM-IV-TR at 29. On multiple occasions, Plaintiff was diagnosed with medical conditions on Axis III, including the 2008 CVA and "late effects of intracranial injury." (*See, e.g.*, Tr. 289, 488, 498, 503, 641.) This is objective evidence of physical conditions

that affect her mental health treatment. As such, the ALJ erred in dismissing Plaintiff's statements without first considering how Plaintiff's illnesses would reasonably interfere with her treatment.

The record shows that Plaintiff requires assistance from others in following up on her treatment. Plaintiff does not drive (Tr. 682) and cannot pass the driving test (Tr. 517), despite rehabilitation driving training, due to "significant distractibility while operating a vehicle" (Tr. 682). Plaintiff's parents attend most appointments with her. (Tr. 510.) On one occasion Plaintiff reported taking Effexor but not mirtazapine, because she did not receive the prescription. (Tr. 529.) She requires reminders to take her medications. (Tr. 239.) This is direct evidence of Plaintiff's inability to manage her care and attend appropriate treatment independently. *See* SSR 16-3p, 2017 WL 5180304 at *10 (an individual may not have access to medical services.) The ALJ's failure to consider this before dismissing Plaintiff's statements and conditions is reversible error.

The very nature of Plaintiff's case-a Title XVI Supplemental Security Income (SSI) claim, which by definition, requires that the individual have limited finances-reflects Plaintiff's financial hardship. It is undisputed that SSI benefits require a showing of both disability and financial need. *See* 42 U.S.C. § 1381a. Plaintiff was already determined financially eligible due to limited income and resources; her claim was denied by the Agency for her purported lack of disability, and not due to financial eligibility. As such, the Agency itself has already concluded that Plaintiff suffers financial need. It is common knowledge that many individuals who have already met the Agency's threshold of financial need often struggle to afford housing, food, clothing, and medical treatment, and this affects their mental impairments. This is critical given the evidence in this case, with many references in the record to Plaintiff's limited finances and struggles with

46

insurance coverage, detailed by her own mental health providers. (*See, e.g.*, Tr. 490; Tr. 505; Tr. 529; Tr. 782.)

This objective evidence demonstrates Plaintiff's difficulties in accessing treatment; the ALJ's failure to consider this before dismissing Plaintiff's statements and conditions is reversible error. *Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001) ("In the absence of such evidence, the ALJ made his own independent medical determination about the appropriateness of doctor visits. This determination was not within the ALJ's province to make."); *see also Hargrove v. Berryhill*, Case No. 1:16-cv-1922-JMS-MJD, 2017 WL 3172917, at *4 (S.D. Ind. June 30, 2017), adopted by 2017 WL 3153582 (S.D. Ind. July 25, 2017) ("Without some explanation of why Hargrove had compliance issues and inconsistent treatment, the ALJ was not permitted to discount Hargrove's credibility on these grounds."). Despite being required to do so under Agency regulations, the ALJ never considered any explanations that might explain why Plaintiff had "routine treatment." Thus, the ALJ erred in dismissing and minimizing Plaintiff's allegations, and as a result, the credibility determination is not supported by substantial evidence.

While the ALJ does identify other factors, these cannot salvage the ALJ's Decision. For example, the ALJ claims that Plaintiff's daily activities (*i.e.*, attending college classes, using public transportation, shopping in stores, using her phone to text and email, completing an internship at Mennonite Magazine, performing household chores) did not support a more restrictive assessment. (Tr. 38-39.) This is improper. First, the ALJ failed to adequately explain how Plaintiff's minimal daily activities were inconsistent with her testimony of disabling limitations. *Laggner v. Comm'r of Soc. Sec.*, Cause No. 1:14-cv-272-SLC, 2016 WL 1237882 at *

11 (N.D. Ind. Mar. 30, 2016). Plaintiff testified that her home and prior work tasks took her a significant amount of time longer than her peers. (Tr. 63, 70, 72, 80, 85, 239, 251, 680.) A boss considered her "too slow" (Tr. 243). Indeed, fatigue has been a major impediment to keep jobs. (Tr. 68, 72.) Her parents confirm the deficits in performing household chores (Tr. 230, 251) and note that, when she shops, she does it with her caseworker (Tr. 252) and cannot manage money (Tr. 232). Her college education was the result of accommodations and the assistance of Vocational Rehabilitation (Tr. 63, 80, 85, 680.) Thus, the ALJ's comment about Plaintiff's "daily" activities cannot support the credibility determination. *Jelinek*, 662 F.3d at 812 ("ALJ[s] may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."). Second, there is no basis to suggest that Plaintiff's ability to perform these activities diminishes her credibility. *See* 20 C.F.R. Listing 12.00(D)(3)(a) ("We will consider the complete picture of your daily functioning, including the kinds, extent, and frequency of help and support you receive, when we evaluate your mental disorder and determine whether you are able to use the four areas of mental functioning in a work setting.").

The ALJ also tried to minimize Plaintiff's statements by pointing to her work attempts after the brain injury. (Tr. 41.) This, too, cannot support the ALJ's credibility assessment. First, the record shows that these were short-lived efforts that did not rise to the level of disqualifying substantial gainful activity (SGA). (See Tr. 204-05.) The work at all of those employers was not even SGA, a threshold element to assess whether the work activity is an unsuccessful work attempt. 20 C.F.R. § 416.974(c). Even the ALJ acknowledged that "it was unclear whether she worked more than six months in total" in 2016 (Tr. 37), the duration required to show an

unsuccessful work attempt. Thus, this evidence bolsters, not undermines, her testimony, because it confirms her inability to sustain employment due to her disabling conditions. Second, that evidence cannot support a negative credibility finding. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) ("The fact that Roddy pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that she was disabled."); *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017). Indeed, Plaintiff was fired from more than one position due to her impairments. (*See, e.g.*, Tr. 66, 234, 255.) All her work has been on a part-time basis and for short periods of time. (Tr. 65-66.) Moreover, Plaintiff has limited income and the ALJ never considered Plaintiff's financial struggles. See Pierce v. Colvin, 739 F.3d 1046, 1051 (7th Cir. 2014) ("a claimant's dogged efforts to work beyond her physical capacity would seem to be highly relevant in deciding her credibility and determining whether she is trying to obtain government benefits by exaggerating her pain symptoms"). Thus, this credibility finding by the ALJ is erroneous and must be reconsidered.

The Commissioner's one paragraph response, identifying what the ALJ considered, cannot serve as substantial evidence. At the outset, it is critical to note that the Commissioner's reliance on the factors is misplaced. The issue is not whether the wrong factors were considered by the ALJ, but rather, the ALJ's application of the factors. Thus, the Commissioner's response is unavailing, as he does not address how the ALJ erred in applying the factors.

Second, the Commissioner's response highlighting the evidence the ALJ considered does not address why that evidence cannot serve as a basis to reject Plaintiff's statements. For example, the Commissioner asserts that the ALJ rejected Plaintiff's statements given her relatively conservative treatment. However, Plaintiff presented evidence that the ALJ erred in

addressing the objective evidence because the ALJ did not consider several reasonable explanations that would account for Plaintiff's treatment history, a clear violation of SSR 16-3p. *Id*., 2017 WL 5180304 at *9 ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."). The Commissioner's failure to address this argument constitutes waiver. The ALJ's consideration of her treatment history cannot serve as a basis in which to reject her statements.

Likewise, the ALJ erred in finding that because Plaintiff could perform some activities, she could perform work consistent with the ALJ's RFC. Equating daily activities with work abilities is not permitted in this Circuit. *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). There is nothing in Plaintiff's ability to perform some activities at her leisure, with accommodations, that suggests that Plaintiff could perform work activities eight hours a day, five days a week, without accommodations. *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Critically, the ALJ did not identify any "daily activity" that he properly considered that would suggest that Plaintiff could perform work activities eight hours a day, five days a week. *Id*. As such, this cannot serve as a basis. Because the ALJ's credibility determination is premised on selective objective evidence and the ALJ's misguided assessment of Plaintiff's daily activities, remand is warranted.

Next, Plaintiff argues that the Step Five decision is not supported by substantial evidence. Plaintiff first argues that the ALJ failed ro resolve the inconsistency in the Medical Expert testimony regarding Plaintiff's mental RFC. Dr. Carney, the medical expert, provided an

assessment of the "B Criteria" (Tr. 90-91) and offered an opinion on Plaintiff's mental RFC (Tr. 91-92). When assessing the mental RFC, Dr. Carney opined Plaintiff could perform "simple, repetitive tasks" but could not "do pace work." (Tr. 91.) Then this exchange took place between the ALJ and Dr. Carney:

> Q: Okay, and social function, you gave her a what?
> A: "You know, I - you know, there I was kind of struggling with maybe occasional contact with the public. Given though, the borderline personality disorder that was given to her, suggests that, that might be - - might have problems with that."

(*Id.*) This testimony suggests that Plaintiff could not have even occasional contact with the public. That's precisely what the ALJ understood because his hypothetical to the VE indicated "no contact with general public." In response to the ALJ's hypothetical, the VE noted that (1) the parameters were for sedentary work (i.e., 2 hours standing/walking, 6 hours sitting), and (2) she had difficulty finding a sedentary job that did not require contact with the public and production quotas. (Tr. 97.) Following this statement indicating, in essence, that there would not be jobs consistent with the hypothetical, there is a confusing exchange:

> ALJ:   Was that correct, you said no contact with the public?
> VE:    I thought he said "occasional."
> DR.    Occasional.
> ALJ:   Occasional contact.
> VE:    Occasional.
> ALJ:   I should change that.
> VE:    It would, it would add a couple of jobs on there.

The ALJ did not ask Dr. Carney to explain the inconsistency between his earlier, more expansive testimony and the brief one-word answer above. This inconsistency was not discussed or resolved, but it is critical. If Plaintiff cannot have contact with the public due to her borderline personality disorder, as Dr. Carney opined and the ALJ understood, then there are no jobs she can

perform, as the VE testified, and she is disabled. Remand is necessary to address this inconsistency.

Dr. Carney testified that, due to her personality disorder, Plaintiff should not have contact with the public. (Tr. 91.) The ALJ understood the restriction and incorporated it into the hypothetical question to the VE. The VE testified that there would be no sedentary jobs that did not require production quotas or contact with the public. (Tr. 97) That testimony would have supported a finding of disability. It is at that point that the VE, not the ME, interjects, "I thought he said occasional," and the ME responds "occasional." (*Id*.) The ALJ then states "I should change that." (*Id*.) The Commissioner's position is that this brief exchange sufficiently clarifies the change in Dr. Carney's opinion, but this lacks merit. At a minimum, the ALJ should have obtained further testimony from Dr. Carney on this contradiction, especially because Dr. Carney stressed that precluding contact with the public stemmed from Plaintiff's personality disorder, and this condition was still present. This one-word response, contradicting previous, more detailed testimony, warranted follow up by the ALJ himself. In the absence of clarification, the ALJ's Step Five Decision is not premised on an accurate and logical bridge. *Spriggs v. Colvin*, 15-cv-1117-JPG-CJP, 2016 WL 7440809, at *5-7 (S.D. Ill. Dec. 27, 2016) ("murky" VE testimony cannot serve as substantial evidence). The Commissioner asserts that Dr. Carney never retracted his opinion of "occasional" contact, but the exchange casts great doubt as to whether this was the most reliable, well-founded aspect of Dr. Carney's testimony. Accordingly, remand is required.

Next, Plaintiff argues that the occupations identified by the VE are inconsistent with the RFC. It is the Agency's burden to show that there is other work existing in significant numbers that Plaintiff can perform considering her RFC and vocational profile. *See* 20 C.F.R. § 404.1520;

*Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). As demonstrated above, the RFC fails to account for all of Plaintiff's limitations and remand is necessary for a proper determination of Plaintiff's RFC. Generally, ALJs must provide a complete picture of a claimant's functional capacity to a VE so there is assurance that expert testimony regarding available jobs took into account all the relevant functional limitations. In *Vargas v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015), the Seventh Circuit noted that "in this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *See also Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor-Spinner v. Colvin*, 627 F.3d 690, 619 (7th Cir. 2016). Here, as detailed above, the ALJ selectively reviewed the evidence, ignoring that which was most favorable to the Plaintiff. Thus, the VE was not provided with all relevant functional limitations and his opinion cannot be considered substantial support for the ALJ's decision.

However, even assuming, *arguendo*, that the RFC is accurate-including that Plaintiff can have "occasional contact with the public"-two of the three occupations identified by the vocational expert exceed the parameters of the ALJ's RFC. The Supplemental Characteristics of Occupations in the DOT (SCODOT) reflects that speaking-signaling is required of an Order Clerk (DOT No. 209.567-014) (see 1991 WL 671794) "frequently," or up to 2/3 of the day. *See* SCODOT, Guide for Occ. Exploration 07.04.02, available at http://www.lb7.uscourts.gov /documents/16-692URL12SelectedCharacteristics.pdf. Thus, this job exceeds even "occasional" contact with the public allowed in the ALJ's RFC. The same inconsistency applies to Information Clerk (DOT No. 237.367-046) (*see* 1991 WL 672194), which under the SCODOT, requires

speaking and signaling constantly, or more than 2/3 of the day. See SCODOT, Guide for Occ. Exploration at 07.04.04. Thus, Information Clerk also exceeds the contact with the public allowed by the ALJ's RFC. Therefore, even assuming that the hypothetical question reflects accurately Plaintiff's limitations, two of the three occupations exceed the parameters of the hypothetical and cannot serve as substantial evidence at Step Five. There remains one occupation, with 8,000 jobs in the entire United States. However, considering the critical inconsistencies in the medical expert's testimony, the Agency is required to reexamine whether this occupation can be performed by Plaintiff. For these reasons, the Agency failed to meet its burden at Step Five.

Plaintiff demonstrated that two of three jobs the VE identified are inconsistent with the RFC and the Commissioner seemingly concedes the point. The Commissioner's position, and the ALJ's entire Decision, entirely rests on the applicability of the Inspector job. However, the Commissioner too narrowly focuses on the public contact aspect. This job is in direct conflict with the ALJ's production quota limitation in the RFC. The DOT description for this job lists the temperament factor of "[a]ttaining precise set limits, tolerances, and standards." 1991 WL 679601. "Temperaments ... are the adaptability requirements made on the worker by specific types of jobs." U.S. Dep't of Labor, Revised Handbook for Analyzing Jobs 10–1 (1991). They have been found to be "important to adjustments workers must make for successful job performance." *Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 610 & n.24 (E.D. Tex. May 21, 2009) (citing Revised Handbook 10–1). The Revised Handbook Analyzing Jobs provides some guidance; it describes attaining precise set limits, tolerances, and standards as "[i]nvolv[ing] adhering to and achieving exact levels of performance, using precision measuring instruments, tools, and machines to attain precise dimensions; preparing exact verbal and numerical records;

54

and complying with precise instruments and specifications for materials, methods, procedures, and techniques to attain specified standards." *See Ryan Patrick A. v. Berryhill*, EDCV 17-2526-JPR, 2019 WL 1383800, at *6 (C.D. Cal. Mar. 27, 2019). This temperament has been interpreted as barring fast-paced or production-quota work. *See Sandra H. v. Comm'r of Soc. Sec.*, No.: 2:17-CV-403-FVS, 2019 WL 289811, at *7 (E.D. Wash. Jan. 22, 2019). In this case, the ALJ found no hourly quotas but end-of-day quotas and, thus, has identified production-quota work. This is a conflict. "If there is an unrecognized, unresolved, and unexplained conflict between the VE's testimony and the DOT, the VE's testimony cannot provide substantial evidence to support the ALJ's disability determination." *Bray v. Colvin*, No. 4:12-01257-CV-W-DGK-SSA, 2013 WL 6510743, at *2 (W.D. Mo. Dec. 12, 2013). Thus, the Inspector job cannot serve as substantial evidence and remand is warranted.

## Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

Entered: December 5, 2019.

s/ William C.  Lee
William C. Lee, Judge
United States District Court